IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JOLENA RENEA SORBARA )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)<br>CARILION ROCKBRIDGE )<br>COMMUNITY HOSPITAL d/b/a )<br>CARILION STONEWALL JACKSON )<br>HOSPITAL, CAROL A. BERNIER, D.O., )<br>and WILLIAM A. FERRELL, P.A., )<br>)<br>   Defendants. ) | Civil Action No. 7:23-cv-00078<br><br>By: Elizabeth K. Dillon<br>     United States District Judge |

**MEMORANDUM OPINION**

Plaintiff Jolena Renea Sorbara brought this action against Carilion Rockbridge Community Hospital ("Carilion Rockbridge" or "the Hospital") and two of its employees, alleging that the Hospital failed to provide her with either an appropriate medical screening examination or the treatment required to stabilize her deep tissue infections in violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA") and that both defendant Carol Bernier (a physician in Carilion Rockbridge's Emergency Department) and William Ferrell (a physician assistant in the same department) committed medical malpractice in violation of Virginia state law. (Compl., Dkt. No. 1.)

Pending before the court is defendants' motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction. (Dkt. No. 2.) After briefing (Dkt. Nos. 3, 10, 11) and oral argument (Dkt. No. 15), the motion is ripe for resolution. Sorbara has also moved for leave to submit a supplemental brief on the motion to dismiss. (Dkt. No. 13.) For the reasons stated herein, the motion for leave to submit a supplemental brief will be denied, and the motion to

dismiss will be granted in part and denied in part.

I. BACKGROUND[1]

On February 8, 2021, at approximately 11:43 a.m., Sorbara visited Carilion Rockbridge's Emergency Department, requesting examination and treatment of infected sores on her right index finger and right thigh, accompanied by chills, nausea, and a fever. (Compl. ¶ 7.) She also reported a "previous 'severe' MRSA [methicillin resistant staphylococcus aureus] infection." (*Id.*) "It was recorded" that Sorbara's sores had erythema (red inflammation) and fluctuance, which is pus that has accumulated under the skin. (*Id.*) The Hospital recorded her "visit diagnosis" as "abscess of finger of right hand (primary)" and "abscess of right leg," and Sorbara alleges that her visit was identified to be of an "emergency" type. (*Id.*)

Ferrell performed an incision, drainage, and debridement of the abscesses in Sorbara's finger and on her right leg. (Compl. ¶ 8.) He reported "bloody and purulent" material; according to the complaint, "[t]he term 'purulent' means the material removed from the abscess contained and/or consisted of pus."[2] (*Id.*) According to Sorbara, "[o]n information and belief, the normal screening examination for the emergency medical condition of infection-producing abscesses containing purulent pus" is to obtain specimens from the infected areas and perform a bacteria culture to identify the bacteria that is causing the infection. (*Id.* ¶¶ 8, 14.) Further, Sorbara asserts that "[t]he normal method of stabilizing" this condition "is to administer broad spectrum antibiotics to prevent the progression of the infection and to prevent the onset of life-threatening sepsis." (*Id.* ¶ 8.) However, the Hospital neither cultured a specimen from Sorbara's sores nor

---

[1] The following facts, drawn from Sorbara's complaint (Dkt. No. 1), are accepted as true for the purposes of this motion. But the court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

[2] She further avers that "'[p]us' is a thick, yellowish, or greenish opaque liquid produced in infected tissue, consisting of dead white blood cells and bacteria with tissue debris and serum." (Compl. ¶ 8.)

gave her antibiotic treatment to stabilize the infections. (*Id.*) Sorbara was discharged at 1:37 p.m., after just under two hours in the Emergency Department. (*Id.*)

In the early morning of February 9, 2021—less than 24 hours after being discharged from Carilion Rockbridge—Sorbara awoke with severe pain in her right thigh and right knee and was unable to walk. (*Id.* ¶ 9.) She returned to Carilion Rockbridge, where she further reported yellow drainage from her abscesses, along with chills, nausea, vomiting, coughing, and a fever. (*Id.*) The Hospital then diagnosed her with severe sepsis and right hand and right thigh infections with cellulitis. (*Id.*) She was then transferred to Carilion Roanoke Memorial Hospital ("Carilion Roanoke") and was hospitalized for 16 days to receive emergency medical treatment for her conditions. (*Id.*) Sorbara has undergone continuing treatment and incurred large medical expenses from the hospitalization and treatment of her infections. (*Id.*)

On February 6, 2023, Sorbara brought this three-count complaint, asserting an EMTALA claim against the Hospital[3] and medical malpractice claims against Ferrell and Bernier. Defendants now move to dismiss the complaint, arguing that it fails to state an EMTALA claim and that, upon dismissal of the EMTALA count, the court should decline to exercise supplemental jurisdiction over the medical malpractice counts.

## II.  DISCUSSION

### A. Sorbara's Motion for Leave to File a Supplemental Brief

Following the hearing on the motion to dismiss, Sorbara moved to submit additional briefing with respect to that motion. (Dkt. No. 13.) Pursuant to this court's Local Rules, "no further briefs" beyond an initial, response, and reply brief "are to be submitted without first

---

[3] Sorbara alleges, on information and belief, that Carilion Rockbridge is a "participating hospital" within the meaning of EMTALA—in other words "a hospital that has entered into a provider agreement under section 1395 cc" of Title 42 of the U.S. Code and thus is subject to EMTALA's requirements. (Compl. ¶ 4.)

obtaining leave of court." W.D. Va. Civ. R. 11(c)(1). Finding further briefing unnecessary to resolve the motion to dismiss, the court will deny Sorbara's motion for leave.

### B. Count One (EMTALA)

#### 1. Motion to dismiss for failure to state a claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In deciding the motion, the court must accept as true all well-pleaded facts in the complaint and in any documents incorporated into or attached to the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but pleadings which are conclusory "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

#### 2. EMTALA

In 1986, Congress enacted EMTALA "in response to a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v.*

*Md. Gen. Hosp.*, 996 F.2d 708, 710 (4th Cir. 1993). As a "limited anti-dumping statute," EMTALA is not a federal medical malpractice statute and was not intended to supplant state malpractice law with a single federal cause of action. *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996).

EMTALA imposes two primary requirements on hospitals. First, "when an individual seeks treatment at a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a). An emergency medical condition is defined as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in–
>
> (i) placing the health of the individual . . . in serious jeopardy,
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part[.]

*Id.* § 1395dd(e)(1). EMTALA's screening requirement does not establish a "national standard of care"; rather, "EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 878 (4th Cir. 1992). Thus, an EMTALA failure-to-screen claim requires the plaintiff to "invoke[] the language of disparate treatment" which is "the linchpin of an EMTALA claim." *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir. 1996). The "adequacy of the screening examination" is not at issue; courts must instead focus on "whether the screening examination that was performed deviated from the hospital's evaluation procedures that would have been performed on any patient in a similar condition." *Baber*, 977 F.2d at 881.

Second, if upon such screening "the hospital determines that the individual has an

5

emergency medical condition, the hospital must provide either . . . within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition," or "for transfer of the individual to another medical facility." 42 U.S.C. § 1395dd(b)(1).  The term "to stabilize" is defined as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" *Id*. § 1395dd(e).  As with a failure-to-screen claim, the inquiry on a failure-to-stabilize claim is limited.  Hospitals are obligated only to stabilize "conditions that they actually detect," as EMTALA "does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers*, 78 F.3d at 145.  Further, the obligation to stabilize applies only to detected emergency medical conditions: "EMTALA's stabilization requirement is focused upon the patient's emergency medical condition, not her general medical condition." *Bryan*, 95 F.3d at 352.  This requirement is satisfied if the hospital provides treatment necessary "to prevent the material deterioration of a patient's condition." *Matter of Baby K*, 16 F.3d 590, 595 (4th Cir. 1994); *see* 42 U.S.C. § 1395dd(e)(3)(A).  Any other claim for inadequate care is "regulated by the tort law of the several states." *Bryan*, 95 F.3d at 351.

       An individual may bring a private civil action for damages for a violation of EMTALA.  Specifically, "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of [EMTALA] may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located." *Id*. § 1395dd(d)(2)(A).

6

3. Analysis

Regarding the failure-to-screen claim, Sorbara alleges that she reported to the Carilion Rockbridge emergency room requesting examination/treatment of infected sores on her right index finger and right thigh, chills, nausea, and a fever, and further reported a "previous 'severe' MRSA infection." (Compl. ¶ 7.) Given that medical information, under EMTALA Carilion Rockbridge would then be obligated to provide a "medical screening examination within the capability of [its] emergency department" that is appropriate for the condition and symptoms identified.[4] Sorbara alleges that the "normal screening examination" that Carilion Rockbridge "routinely provide[s]" to patients presenting as she did is "to obtain a specimen to culture to determine what type of bacteria is causing the infection." (Compl. ¶¶ 8, 14.) And finally, she asserts that Carilion Rockbridge failed to provide such a screening.

To be sure, many of the complaint's factual allegations are confusingly worded. For example, in several paragraphs the complaint provides different descriptions of Sorbara's "emergency medical condition" with varying levels of specificity—first referring to "infected sores" (Compl. ¶ 7), then "infection-producing *abscesses containing purulent pus*" (*id.* ¶ 8), and finally referring to "*multiple deep tissue* infections producing pus-filled abscesses" (*id.* ¶ 14). This introduces some ambiguity as to the precise state in which Sorbara presented at the Carilion Rockbridge—especially considering the later allegation that Sorbara's visit diagnosis only

---

[4] On brief, defendants assert that "[a]n infection—and the severity thereof—is a diagnosis, not a symptom, and EMTALA is not meant to ensure correct diagnoses." (Dkt. No. 3 at 7.) True as that may be, less clear is what effect, if any, that has on the viability of Sorbara's failure-to-screen claim. If a prospective patient arrives at an emergency room, claims to be experiencing certain symptoms, and also alleges that he or she suffers from a particular condition, it seems then that the hospital's obligation under EMTALA would be to conduct a screening that is appropriate for the patient's overall state—including both the symptoms and conditions that he or she claims to have. In other words, if Sorbara arrived at Carilion Rockbridge claiming to have infected sores and a host of symptoms, Carilion Rockbridge would have been obligated to screen Sorbara in the same manner it would any patient claiming to have that condition and those symptoms, regardless of whether Carilion Rockbridge had itself diagnosed the alleged condition first.

reflects an "abscess of [the] right finger of [the] right hand (primary)" and an "abscess of [the] right leg" (*id.* ¶ 7). But at bottom, she does allege that she presented with infected sores and a variety of symptoms yet did not receive the type of screening that Carilion Rockbridge would ordinarily conduct for patients so presenting. Whether Sorbara will ultimately be able to marshal evidence to that end at trial or in opposition to a motion for summary judgment is unclear, especially given the extent to which her allegations are based "upon information and belief."[5] But to the extent the above allegations are true, the complaint satisfies *Iqbal*'s liberal requirement that there be "more than a sheer possibility" that Carilion Rockbridge failed to sufficiently screen Sorbara. *Iqbal*, 556 U.S. at 678.[6] In sum, although Sorbara's complaint "is not a model of clarity, at this junction, it is sufficient" to state a failure-to-screen claim under EMTALA. *See Van Tassel v. Cnty. of Columbia*, No. 1:04-CV-00886 (GLS), 2006 WL 8452023, at *2 (N.D.N.Y. Sept. 21, 2006).

However, with respect to the EMTALA failure-to-stabilize claim, Sorbara's scattered allegations are deficient. In claiming that Carilion Rockbridge failed to treat her, Sorbara described the mode of treatment that the Hospital would normally employ for a patient with

---

[5] Defendants take issue with Sorbara's reliance on "information and belief" in forming her allegations. True, such reliance might signal that the underlying proof is "tenuous at best." *Raub v. Bowen*, 960 F. Supp. 2d 602, 615 (E.D. Va. 2013). But "[a] plaintiff is generally permitted to plead facts based on 'information and belief' if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). With respect to the Hospital's ordinary practice for screening and treating certain types of patients, that is the situation here. Defendants make the broad assertion that "[a]llegations of EMTALA violations made solely on information and belief 'raise questions about the sufficiency of the EMTALA claim.'" (Dkt. No. 10 at 8 (quoting *Ferguson v. Centura Health Corp.*, 358 F. Supp. 2d 1014, 1020 (D. Colo. 2014)).) But in doing so, they ignore that, in the *Ferguson* case to which they cite, the court was concerned primarily with "*the* information and belief pleadings" *in that particular case*—not with information-and-belief pleadings generally. *See Ferguson*, 358 F. Supp. 2d at 1020 (emphasis added). Indeed, that skepticism was warranted in *Ferguson* because the allegations in question "relate[d] to facts that should be within the plaintiffs' own knowledge," *see id.*, unlike the allegations at issue in this case.

[6] *See also Dingle v. FedEx Corp.*, No. 3:22-cv-600-MOC, 2023 WL 3959381, at *4 (W.D.N.C. June 9, 2023) ("[W]hile the Court agrees with Defendant that Plaintiff could have provided more factual details as to his [ ] claim, the bar to surviving a Rule 12(b)(6) motion is not a high one. Rather, the pleading standards of *Iqbal* and *Twombly* remain liberal, and a motion to dismiss must be denied as long as the allegations plausibly give rise to an entitlement to relief. Plaintiff has satisfied that burden at this stage in the proceedings.").

"multiple deep tissue infections producing pus-filled abscesses, chills, and fever." (Compl. ¶ 14.) But according to the complaint, the Hospital's diagnosis of Sorbara only reflected an "abscess of [the] right finger of [the] right hand (primary)" and an "abscess of [the] right leg." (*Id.* ¶ 7.)

As noted earlier, on a failure-to-stabilize claim, EMTALA "takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect." *Vickers*, 78 F.3d at 145. Indeed, *Vickers* itself presented a failure-to-stabilize claim in which the plaintiff evidently assumed that the doctor should have diagnosed him differently and alleged that the hospital failed to stabilize the condition it never diagnosed. The Fourth Circuit affirmed dismissal of that claim, reasoning that "[a]nalysis by hindsight . . . is not sufficient to impose liability under EMTALA." *Id.* "Instead, a hospital must actually perceive the seriousness of the medical condition and nevertheless fail to act to stabilize it." *Id.* Here, Sorbara's claim is, in essence, that she was not treated in the same manner as Carilion Rockbridge would ordinarily treat someone with multiple deep tissue infections—a condition which, according to Sorbara's own complaint, the Hospital never diagnosed. Because the Hospital is not obligated to treat conditions it does not detect, Sorbara's failure-to-stabilize claim must fail as a matter of law.

In sum, the court will grant in part and deny in part the motion to dismiss Count One; the motion will be denied to the extent Sorbara alleges an EMTALA failure-to-*screen* claim but will be granted to the extent Sorbara alleges an EMTALA failure-to-*stabilize* claim.

## C. Supplemental Jurisdiction Over Counts Two and Three (Medical Malpractice)

Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." The Fourth Circuit has provided that "courts enjoy wide latitude in determining

9

whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In exercising its discretion, the court must consider factors of judicial economy, convenience, fairness, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Generally, though, when a case is in its early stages, courts will decline to exercise jurisdiction. 13D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, (3d ed., April 2022 update) ("[I]f the jurisdiction-invoking federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.")

Here, because the federal EMTALA claim in Count One will survive the motion to dismiss with respect to a failure-to-screen theory, the court has not dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Finding no other "compelling reasons for declining jurisdiction," *see id.* § 1367(c)(4), the court will exercise supplemental jurisdiction over Counts Two and Three.

### III. CONCLUSION

For the foregoing reasons, Sorbara's motion for leave to file a supplemental brief (Dkt. No. 13) will be denied, and defendants' motions to dismiss (Dkt. No. 2) will be granted in part and denied in part. The court will issue an appropriate order.

Entered: August 28, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge